[Civ. No. 4475. Third Appellate District.—March 5, 1932.]

EMIL J. HAWEIS, Respondent, v. S. BADDOUR, Appellant.

Charles J. Kelly, A. G. Alm and Hill, Morgan & Bledsoe for Appellant.

Perry F. Backus, Leonard Wright and Frazier McIntosh for Respondent.

MILLER, J., *pro tem.*—This is an appeal from a judgment in favor of respondent for $63,000. Plaintiff's claim is predicated on a charge of usury. The facts, as appear from the complaint and from the transcript of the evidence in the case, are as follows:

Respondent and appellant were, and for a number of years had been, friends. Respondent lost his wife in December, 1925, and was in financial straits. This was known to appellant. Respondent's deceased wife had left an estate worth $408,000, which was her separate property at the time of her marriage to respondent. Subsequent to their marriage, and on January 12, 1925, respondent and his wife entered into an agreement by the terms of which she agreed to bequeath to him one-half of her property, he agreeing "to be faithful to his wife and to perform his marital duties in providing for and caring for his wife". The record fails to show any evidence indicating that respondent in any respect failed to perform his part of such agreement. Mrs. Haweis left a last will by which she devised one-half of her said property in the following words: "While, by antenuptial agreement between myself and my husband, Emil Haweis, it was among other things provided, that on the death of either the survivor should have only one thousand dollars ($1000) from the estate of the deceased, and should not because of said marriage inherit or in anywise receive any of the property of the other, and while all my property is my own separate property, nevertheless, having made an agreement dated January 12, 1925, with my husband, that in case of my death prior to his I would bequeath to him a half interest in certain property in said agreement described, upon certain conditions, therefore in compliance with and in satisfaction of said agreement, providing he survives me, and providing that he is faithful to me and performs his marital duties in caring for and abiding with me, I give, devise, and bequeath to my said

husband, Emil Haweis, the undivided one-half of the following described real estate, to-wit'': (then follows a description of certain real property that was appraised in her estate at $408,000).

After the death of his wife, respondent remained in possession of the home and the furniture therein. In the latter part of March, 1926, the sheriff of the county of Los Angeles, presumably by virtue of some process, the nature of which the record fails to show, took possession of the household goods and furniture and placed a keeper in respondent's home. The sheriff required a bond in the sum of $1,000 before he would release said household goods and furniture. Appellant was asked by respondent to furnish the bond upon the assurance of respondent's attorney, who was a brother of appellant, that the bond would only be required for two or three weeks, and thereupon appellant, in order to secure the bond, deposited with a surety company securities aggregating $20,000. It later developed that the bond was required for a much longer time than was contemplated, it being nearly a year before appellant was able to withdraw his securities as a whole, although he was permitted by the surety company to withdraw some of the bonds so he could "play the market" with them, upon his substituting other securities with the surety company. After these securities had been on deposit with the surety company for three or four weeks, appellant made repeated objections to leaving them up as security and, apparently, made it so disagreeable for respondent that he promised appellant he would pay him $2,000 for the use of his securities during the time the bond was required. Shortly thereafter respondent sought a loan of $7,000 from the appellant, and together they visited an attorney to arrange for security. From the conversation that took place between appellant and the attorney, the avariciousness and greed of appellant and his persistent purpose to disregard or to circumvent the Usury Law, are demonstrated. The testimony in that regard is, in part, as follows: "My name is C. T. Van Etten. . . . I am an attorney-at-law. I am acquainted with Emil J. Haweis, the plaintiff in this action. I have met Mr. S. Baddour, the defendant, several times. I recall having had a conversation with these two parties about the month of June, 1926, with respect to a loan agreement be-

tween the parties. The discussion was had at my office.
. . . My client, Dr. Haweis, and Mr. S. Baddour were present, and possibly a Mr. Shipley. . . . Dr. Haweis said that he was considering borrowing some money from Mr. S. Baddour, and that they would like to have me prepare the papers for them. . . . S. Baddour said that he contemplated loaning Dr. Haweis an indefinite sum of money, possible up to $25,000 or $30,000, ultimately, upon his interest in the estate of Dr. Haweis'' deceased wife. . . . He also asked whether I thought Dr. Haweis' interest in the estate was such that it would be considered good security. I think he asked whether it would be considered good by a bank or a mortgage company or other organization in the money loaning business. I replied that it would not be considered good security by such an institution; that Dr. Haweis' interest under the terms of the will was contingent upon his distribution of the estate, and also contingent upon some other matters. That there was already some litigation pending and that more was threatened in an attempt to prevent Dr. Haweis from collecting his share of the estate, or at least in delaying him in collecting it, and that we might as well recognize the fact that we were confronted with litigation. And that the probabilities were that there would be a long delay before this probate matter could be settled. I also told him that Dr. Haweis' interest was unquestionably a very valuable one; that it was worth a lot of money but nobody could say just how much; that I considered that we had a very good chance to win any litigation that was pending or threatened . . . that the probabilities were that there would be an appeal or appeals which would take a long time, probably several years before the estate would be finally distributed, and that if Dr. Haweis should not survive the period of litigation and distribution his rights under that will at least would terminate. I also told him, however, that Dr. Haweis held an antenuptial contract or agreement made between him and his wife before they were married, and that there was a subsequent or post-nuptial agreement by the terms of which he was given some pretty definite rights, and I thought we could sustain them even if he did not survive. . . . Mr. Baddour said to me, 'I have decided to make Dr. Haweis a loan. I realize that the nature of his interest is not certain, but I am willing to

take a chance. I am in the business of playing the stock market anyway, I take chances with my money and my money has to earn big money for me. I am willing to make him a loan, but I must have a big profit if I make that loan.' I said, 'How much?' He said, 'Well, not less than a hundred per cent.' I said, 'Well, Mr. Baddour, you may as well understand right now that any such transaction as that is out of the question. We have a usury law in this state which prohibits people from taking more than twelve per cent interest on loans, and such a proposition as you mention would not only be improper but would be absolutely unlawful, and you may as well forget it.' He said, 'It is a very peculiar law, Mr. Van Etten, that will not permit two friends to enter into an agreement to do what they both want to do. Dr. Haweis is my friend and I am his friend. Neither of us would ever take any advantage of such a law as that.' I replied that that made no difference whatever, that the law was enacted for the purpose of preventing people who were in more or less needy circumstances from entering into such agreements; if such an agreement was made it would be unenforceable, at least as to interest or bonus, and that it would be improper and that I would not permit my client to enter into such a transaction. . . . They left the office but in a very few minutes Mr. S. Baddour, I think, returned alone. Mr. Shipley may have come back with him, but I am not certain. He said, 'I am ready to take your advice on that, Mr. Van Etten. I won't make it in the form of a loan; I will take a deed instead of a mortgage.' I said, 'Mr. Baddour, that won't make any difference. Such a deed would be only a mortgage, and the transaction would still be usurious. You cannot take a profit of more than 12 per cent from anyone.' He said, 'There must be some way to get around that law.' I said, 'There is not.' He said that he thought it was being done right along, and I replied that it might be done but it was not legal or enforceable. He asked if there was not any way that he could make a profit on such an investment. I said, 'There is no way unless you want to absolutely buy out, purchase, Dr. Haweis' interest in his estate. I do not understand it is for sale, but if you could agree upon a sale and make an absolute purchase from him, step into his shoes, become the defendant in the existing litigation, be ready to

file the will contest in his place if it becomes necessary to file it, let him out, after you step in, if you are ultimately successful and if your assignment is good, you would probably be entitled to receive whatever he would otherwise get. . . . ' Mr. Baddour said, 'If I should do that and be unsuccessful in this litigation what would I have to show for my loan?' I said, 'I am trying to make you see that that would not be a loan. You would have nothing to show for it; you would have lost your money.' He said, 'Well, I could not do that, I must have notes to show for the money I loan. I could not have anything to do with that kind of a proposition; but I can take a deed.' I said, 'I told you that such a deed would be only a mortgage and I do not want to have any more talk about this transaction. If you insist on such a profit I cannot help you, and I cannot talk to you any further in the absence of my client. . . . ' He went away and I never had any further conversation with Mr. S. Baddour about a loan until the day of the probate sale. . . . I told Mr. S. Baddour that I had been advised by the title company that there was a deed on record from Dr. Haweis to S. Baddour and that we now had an opportunity to make a probate sale of a portion of the property in this estate for a sufficient amount of money to enable us to close the probate and to definitely fix and determine the rights of Dr. Haweis and everybody else; that I deemed it highly important that this sale go through without delay for the protection of Dr. Haweis' interests and also for the protection of Mr. S. Baddour's interest, if he held a deed from Dr. Haweis. He said that he did have such a deed. . . . He said, 'That Dr. Haweis and I have an agreement under which I am to receive $30,000. I won't sign any quitclaim, or anything else unless I can get my money.' I said, 'There is not any way to get you that much money in cash at this time, but if Dr. Haweis is willing he can make an assignment to you of the sum of $30,000 of his share of the proceeds of this probate sale to be distributed direct to you when the probate is closed. That is the only way I see for you to get your money.' . . . He said no he would not sign anything unless he got the entire $30,000 which his contract called for. . . . Mr. S. Baddour said to me, 'Now, I want it understood that this $30,000 is my bonus and that Dr. Haweis still owes me $27,000 on his note.''

Samuel A. Shipley testified, in substance, as follows: "I am acquainted with the plaintiff and defendant in this action, I recall having a conversation with Mr. S. Baddour with respect to making a loan to Dr. Haweis. . . . There were present just Mr. Baddour and myself. Mr. Baddour came to me with a proposition and spoke to me, 'Shipley, there is a big chance for us to make some good money.' I said, 'What is it? Some new dope on the market?' He said, 'No, it is far better than that, it is much surer than a tip on the market.' I said, 'What is it?' He said, 'Dr. Haweis is in very bad straits and needs money very badly. If you and I combine and give him a loan we will make good returns.' I said, 'What do you mean?' He said, 'Well, we can charge any amount we want on that loan.' I said: 'Do you mean to tell me that you are going to charge Dr. Haweis, your best friend, an exorbitant price?' He said, 'Well, you know Dr. Haweis has no family; you have got a family and I have a family.' I said, 'Well, I am awfully sorry, Shickery—that is his first name— . . . I am awful sorry that I can't do it. First of all, I am very fond of the doctor and I would not care, if I had the money to loan him, to charge him an exorbitant amount. . . . ' I said, 'My advice to you is not to do anything of the kind.' . . . He told me he would have to loan him as much as $30,000 possibly. . . . He said that he expected to make at least two or three hundred per cent on the investment. . . . There was never any conversation between me and Mr. Baddour as to buying the Doctor's half interest. . . . That deal is substantially as I have testified to before, with respect to making a loan up to twenty thousand or thirty thousand dollars, and at least two or three hundred per cent on the loan."

It is significant that the substance of appellant's denials concerning the damaging testimony of C. T. Van Etten, hereinbefore set out, was practically confined to a denial that he was to get $30,000 as a bonus—he claiming that Mr. Van Etten made a mistake in calling it a "bonus"; that what he said was that the word he used was "profit", not "bonus". He likewise denies that he told the witness Shipley that he contemplated making a bonus of from two hundred to three hundred per cent with the money he proposed to loan respondent. He did not, however, deny that he told

Mr. Van Etten that he must have one hundred per cent profit.

It appears from the testimony of respondent that while the litigation was pending he sought to borrow $7,000, whereupon appellant demanded and received a deed to some property belonging to respondent at Cardiff, in San Diego County, California. A few weeks later appellant loaned respondent $10,000 more and demanded and received an agreement for the payment of a bonus of $20,000. Later appellant made a further loan of $10,000 to respondent, which, with the previous loans, aggregated $27,000, whereupon the agreement providing for a bonus of $20,000 was torn up and another, providing for $30,000, was made. By the terms of the foregoing agreement, which included a deed, appellant received as security for his loan the Cardiff property that was outside of the estate of Mrs. Haweis, and also an undivided one-half of respondent's interest in the estate of Mrs. Haweis.

Subsequently a settlement of the litigation was effected and there still remaining outside of appellant's control an undivided one-half interest in what respondent had by the terms of the settlement definitely recovered, a further contract was entered into between respondent and appellant on January 28, 1927, by the terms of which all of the remaining interest of respondent in the estate of his deceased wife was taken over as security for the payment of said indebtedness of $27,000.

The evidence does not expressly disclose, but it is a fair presumption that the latter contract was made at the behest of appellant inasmuch as it added greatly to his security, and, further, encumbered respondent's interest in the estate of Mrs. Haweis.

The bonus of $30,000 was paid to appellant by respondent on or about August 13, 1927, out of the estate of Mrs. Haweis and in accordance with an assignment of that amount to be paid out of the proceeds of the probate sale.

Appellant claims that he purchased outright the one-half interest of respondent in the estate of Mrs. Haweis for $2,000, although a consideration of $10 is named in that deed, and that the instruments executed to him by respondent were not intended as security for a loan, while respondent insists that, regardless of the terms of the agreements,

deed and assignment, they were each executed and delivered for the sole purpose of securing to appellant the repayment of $27,000 which he had loaned to respondent, and to also secure the payment of the bonus of $30,000 which the appellant was to receive net.

The evidence does not sustain appellant's contention that he purchased respondent's interest in the estate of Mrs. Haweis, but the evidence does sustain the finding of the trial court to the effect that the instruments in question constituted a mortgage; hence it is unnecessary to notice in detail the cases appellant cites as supporting his contention in the event there was a *bona fide* sale; they are not applicable here, where every contract, deed or assignment disclosed by the record appears, from the circumstances shown by the evidence, to have been executed and delivered for the sole purpose of securing to appellant the payment of the loan of $27,000 and the bonus of $30,000.

In *Todd* v. *Todd*, 164 Cal. 255 [128 Pac. 413, 414], the court said:

"The appellant's principal contention is that the evidence is insufficient to justify the finding that the instrument executed by plaintiff and defendant was a mortgage. That a deed absolute in form may, by parol testimony, be shown to have been intended to be a mortgage is not questioned as, of course, it could not be, in view of the many authorities so holding. A few citations will suffice. (Civ. Code, sec. 2924; *Montgomery* v. *Spect*, 55 Cal. 352; *Malone* v. *Roy*, 94 Cal. 341 [29 Pac. 712]; *Woods* v. *Jensen*, 130 Cal. 200 [62 Pac. 473]; *Holmes* v. *Warren*, 145 Cal. 457 [78 Pac. 954]; *Couts* v. *Winston*, 153 Cal. 688 [96 Pac. 357].) If the deed was intended merely as a security for the payment of a debt, it is a mortgage, 'no matter how strong the language of the deed or any instrument accompanying it might be'. (*Woods* v. *Jensen*, 130 Cal. 200 [62 Pac. 473].) Although it has often been said that the character of an absolute deed cannot be changed to that of a mortgage except 'upon clear and convincing evidence', the rule is well settled that, where there is a substantial conflict, it is primarily for the trial court to determine whether the evidence in favor of the claim of mortgage is clear and convincing'. (*Couts* v. *Winston*, 153 Cal. 688 [96 Pac. 357], and cases cited.)"

The trial court had the right to accept the testimony of plaintiff as true, and that it evidently did.

In the case of *Couts* v. *Winston, supra,* the court also said:

"The circumstances of the whole case, if we accept the testimony acted on by the trial court, are entirely consistent with the view that the parties, while in fact agreeing on a loan to be secured by mortgage, were desirous, for reasons of their own, of giving the transaction a different appearance." (*Hodgkins* v. *Wright,* 127 Cal. 688 [60 Pac. 431]; *Rosemead Co.* v. *Shipley Co.,* 207 Cal. 414 [278 Pac. 1038].)

In the case before us, it is not difficult to divine the motives that prompted appellant to attempt to cause the transaction to have an appearance of a purchase and sale. The testimony shows that he declared it was a peculiar law that would not allow friends to do as they wished; that there must be some way to get around such a law; that he could not think of purchasing outright the interest of respondent, and take the chance of losing all he put into the proposition in the event the litigation should be unsuccessful—that he must have notes to show for what he loaned.

As is stated in California Jurisprudence, volume 17, page 789:

"A man is not presumed to sell his property for very much less than it would be valued in the market; and if the consideration is grossly inadequate a court will not readily believe that the grantor intended to sell."

We cannot agree with appellant's contention that the deed here involved was executed and delivered partly in consideration of the satisfaction of a former indebtedness of $2,000. The deed was merely a mortgage and hence the authorities cited in support of that contention by appellant are not in point. The $2,000 indebtedness referred to was the amount which respondent agreed to pay appellant for the use of his securities in obtaining a bond to release his furniture. Appellant contends that this $2,000 was a part of the consideration for the execution of the deed, but the testimony of respondent is clear and unequivocal to the effect that he had definitely agreed with appellant to pay him a thirty thousand dollar bonus for the loans due him,

and that appellant, at the suggestion of his own brother (who was a lawyer associated with Mr. Van Etten as representing respondent in the estate matter) to the effect that the thirty thousand dollar bonus, which it had been agreed appellant should receive, was sufficient for appellant to get out of the transaction, and that he ought to give back to respondent the note he held for the $2,000, thereupon gave said note back to respondent. It seems clear that this transaction constituted a gift, as strange as it may seem, of the amount of $2,000 that was then due from respondent to appellant. However, it may well have occurred to appellant at the time that it was good policy to forgive to his dear friend $2,000 in the hope that by so doing he would save any question being raised as to his right to receive the bonus of $30,000, for respondent had, just previous to the surrender of said $2,000 note, made the remark to appellant that he thought appellant was going to ''skin him like a Shylock''. The bonus that had been agreed upon was neither increased nor decreased as a result of the magnanimous gift of the $2,000, and the effect of the transaction was nothing more nor less than to entirely remove the $2,000 indebtedness from consideration. In all other respects the transaction remained exactly as it was before.

The court, in *Chapman* v. *Hicks*, 41 Cal. App. 158 [182 Pac. 336, 338], said:

'' 'The presumption arising from the execution and delivery of a deed absolute in form is, undoubtedly, that it is made in pursuance of an agreement to sell, and vests an absolute title in the grantee. . . . At the same time the court has been watchful against all schemes of moneylenders to deprive unfortunate debtors of their lands at less than their value, under the claim that the transaction was a purchase, and not a loan.' (*Locke* v. *Moulton*, 96 Cal. 22, 29 [30 Pac. 957, 959].)''

While it is primarily a question for the trial court to determine what the intention of the parties was, there is clear and convincing evidence in the record before us that appellant never at any time considered that he was not loaning money to respondent, or that he did not demand and take the various deeds and assignments as security for the sums he claimed were due him, although it is apparent that he sought to conceal the fact, but it is most improbable

that respondent would sell one-half of what he expected to receive from the estate of Mrs. Haweis for $2,000, and such sums, if any, that he was obligated to pay as a result of the contemplated litigation.

Appellant argues that there seems no good reason why he should undertake to expend the money in the litigation to determine respondent's rights, when his sole return in the event of success was to be the repayment of the amount of money expended with interest, and receive nothing for the "hazard" he incurred. This argument is based upon a false premise and begs the question under consideration. We think the most that can be claimed for the so-called "hazard" appellant claims he took in the agreement dated June 22, 1926, was that he agreed, in effect, to advance the costs of the litigation, if that should become necessary—which it never did—such costs consisting of "court costs, stenographic or phonographic reporter's fees, typewriting and printing, process-serving", etc., none of which appellant ever paid.

The main hazard emphasized by appellant is the payment of the attorney's fee respondent had agreed to pay. That fee was expressly made a contingent fee—a percentage of the recovery, dependent upon a recovery. Yet appellant reiterates throughout 145 pages of his briefs, the great "hazard" appellant accepted. This "hazard" he claims became a reality in this, that he, being the owner of one-half of the property recovered, one-half of the attorney's fee came out of his share of the estate, and, hence, that he was saddled with the one-half of such attorney's fee. But, as we have said, he was not the owner of what he claims, nor was he the owner of any part thereof, and never paid any part of the contingent attorney's fee. Besides appellant never was under any obligation to pay or to advance any sum whatever on account of attorney's fees. Whatever trifling sum he might have been obligated to advance as costs, he never paid in whole nor in part—the same being paid by respondent and, hence, that portion of the great "hazard" incurred by appellant as costs, like the contingent attorney's fee, has no substantial basis upon which to rest. The sum loaned never was put in hazard, nor was any part thereof put in hazard. Appellant always held respondent's unconditional promise to pay, and at all times

had ample security for the repayment thereof, as well as the repayment of all sums that he was, by any stretch of the imagination, obligated to pay, and there was no uncertainty concerning the transaction. He held a mortgage, in the form of a deed, on appellant's Cardiff property into which the moneys he loaned appellant went, and which was worth many times the amount of the loans plus any possible advances, plus the $30,000 bonus, for the Cardiff property had on it a hundred thousand dollar building; to say nothing about the lien he held against respondent's interest in the Haweis estate.

The finding of the trial court is to the effect that the bonus of $30,000 was a bonus for the loans aggregating $27,000 and the evidence is ample to support the finding.

Complaint is made by appellant of the order of the trial court permitting the filing of an amended complaint at the conclusion of plaintiff's case. The question as to whether or not an amended complaint should be filed is a matter very largely in the discretion of the trial court, and, so long as there is no abuse of discretion, the ruling of the court below should not be disturbed. We cannot see wherein appellant has. been in any manner prejudiced by the fact that the amended complaint was filed. The trial court did not, therefore, err in making the order complained of, neither did the court err in denying appellant's motion for a new trial.

In view of what we have above said, it is not necessary to mention in detail the four main points upon which appellant relies for a reversal. Each point has been definitely decided against appellant's contention.

The judgment is affirmed.

Thompson, J., and Plummer, Acting P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 4, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 2, 1932.